JILL P. TELFER, (State Bar No. 145450)
LAW OFFICES OF JILL P. TELFER
A Professional Corporation
331 J Street, Suite 200
Sacramento, California 95814
Telephone:    (916) 446-1916
Facsimile:    (916) 446-1726
email: jilltelfer@yahoo.com

Attorney for Plaintiff
**BRIAN SETENCICH**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRIAN SETENCICH,

               Plaintiff,

vs.

THE AMERICAN RED CROSS, a non-profit
corporation, STEVE BROWN, ROBERT
BROWNING and DOES 1 through 30,
inclusive,

               Defendants.

CASE NO.: C 07-03688 JCS

**DECLARATION OF JILL P. TELFER IN
SUPPORT OF PLAINTIFF'S REPLY TO
DEFENDANT AMERICAN RED CROSS'
OPPOSITION TO THE MOTION TO
COMPEL DEFENDANT TO FURTHER
RESPOND TO PLAINTIFF'S REQUEST
FOR PRODUCTION OF DOCUMENTS,
SET ONE AND PRODUCE DOCUMENTS**

Date:    July 2, 2008
Time:    1:00 p.m.
Ctrm:    3
Judge:  Hon. Saundra Brown Armstrong

**I, JILL P. TELFER, DO DECLARE:**

1.    I am an attorney licensed to practice before this Court.  I represent plaintiff Brian

Setencich ("Setencich") and  have personal knowledge of the facts stated herein unless stated

otherwise.

2.    I served the American Red Cross ("ARC") with Setencich's Department of Fair

Employment and Housing ("DFEH") charge by mail on March 13, 2007.  I filed the civil complaint

on March 8, 2007, with Defendants being served on or about June 19, 2007.

3.    My purpose in propounding the subject discovery is to prove association

discrimination.  Since Defendant American Red Cross ("ARC") has not admitted a discriminatory

animus against all disabled employees or a blanket policy denying disabled individuals' rights or

1

1  benefits provided to non-disabled employees, I have to prove the underlying disability discrimination

2  of Marc Jackson ("Jackson").

3       4.  ARC contends that I have propounded Request No. 1 to Plaintiff's Demand for

4  Production of Documents, Set One to conduct "backdoor discovery" for Jackson, who filed two

5  Department of Fair Employment and Housing Complaints against ARC. If Jackson decides to file

6  suit, he will have access to the subject discovery and therefore there is not need for me to "backdoor"

7  discovery as accused by defense counsel. The charges for Jackson were filed on March 14, 2007 and

8  March 6, 2008, respectively. I served the first charge by mail on ARC on March 27, 2007.

9       5.  Attached hereto as Exhibit 1 is a true and correct copy of Setencich's First Amended

10  Complaint filed on November 8, 2007. Attached hereto as Exhibit 2 is a true and correct copy of

11  ARC's answer filed on March 26, 2008.

12       6.  Attached hereto as Exhibit 3is a copy of an e-mail from September 9, 2005, with

13  Defendant Steve Brown admitting he would interview Brian Setencich and give him a fair shake.

14  (Page 2) (The document was authenticated by Jackson at his deposition and marked as deposition

15  Exhibit 26.)

16       7.  Attached hereto as Exhibit 4 is a true and correct copy of excerpts of Jackson's

17  deposition conducted on January 30, 2008.

18       8.  Attached hereto as Exhibit 5 is a true and correct copy of a Personnel Action

19  Requisition which Jackson testified he initiated to hire Setencich. Defendant Steve Brown and

20  Robert Browning both testified a Requisition must be generated and approved before an individual

21  can be hired or rehired.

22      I declare under penalty of perjury that the foregoing is true and correct and that this

23  declaration was executed under the laws of the State of California on June 12, 2008 at Sacramento,

24  California.

25

26

27      JILL P. TELFER

28

TELFER DECLARATION IN SUPPORT OF REPLY TO DEFENDANT'S OPPOSITION TO THE MOTION TO
COMPEL FURTHER RESPONSES AND DOCUMENTS

**PROOF OF SERVICE**

CASE:    *Brian Setencich v. The American Red Cross, et al.;* United States District Court of California, Northern District

CASE NO:    **C 07-03688 SBA**

I, the undersigned, declare I am a citizen of the Unites States and am employed in the County of Sacramento, State of California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 331 J Street, Suite 200, Sacramento, CA 95814.

I am readily familiar with this firm's practice for collection and processing of correspondence for mailing with the United States Postal Service. On the date indicated below, I served the following documents by:

to be served on the party(ies) or their (its) attorney(s) of record in this action:

[X]    Via Mail: I caused each envelope (with postage affixed thereto) to be placed in the U.S. mail at Sacramento, California.

[ ]    Via **CERTIFIED** Mail: I caused each envelope (with postage affixed thereto) to be placed in the U.S. mail at Sacramento, California.

[ ]    Via Personal Service: I instructed each document to be hand-delivered via **HAND DELIVERY** to the address listed below.

[ ]    Via Overnight Courier: I caused each envelope to be delivered via overnight mail by **FEDERAL EXPRESS.**

[X]    Via **FACSIMILE:** I instructed such to be transmitted via facsimile to the office(s) list below.

**DOCUMENTS SERVED:    DECLARATION OF JILL P. TELFER IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT AMERICAN RED CROSS' OPPOSITION TO THE MOTION TO COMPEL DEFENDANT TO  FURTHER RESPOND TO PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS, SET ONE AND PRODUCE DOCUMENTS**

ADDRESSED TO :

Sabrina L. Shadi, Esq.
BAKER & HOSTETLER
12100 Wilshire Blvd., 15th Floor
Los Angeles, CA 90025-7120

I declare under penalty of perjury that the foregoing is true and correct. Executed June 12, 2008, at Sacramento, California.

Camille Rasmussen

3

TELFER DECLARATION IN SUPPORT OF REPLY TO DEFENDANT'S OPPOSITION TO THE MOTION TO COMPEL FURTHER RESPONSES AND DOCUMENTS

# EXHIBIT 1

1  JILL P. TELFER (State Bar No. 145450)
   LAW OFFICES OF JILL P. TELFER
2  A Professional Corporation
   331 J Street, Suite 200
3  Sacramento, California 95814
   Telephone: (916) 446-1916
4  Facsimile: (916) 446-1726
   email: jilltelfer@yahoo.com
5
   Attorney for Plaintiff **BRIAN SETENCICH**
6

7

8              UNITED STATED DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10                  OAKLAND DIVISION

11

12  BRIAN SETENCICH                    ) Case No. C 07-03688 SBA
                                       )
13         Plaintiff,                  ) **FIRST AMENDED COMPLAINT FOR**
                                       ) **EMPLOYMENT DISCRIMINATION**
14         vs.                         )
                                       )
15  THE AMERICAN RED CROSS, a non-profit ) **\*\*\*\* JURY TRIAL DEMANDED\*\*\*\***
    corporation; STEVE BROWN; ROBERT   )
16  BROWNING; and DOES 1 through 30, inclusive, )
                                       )
17         Defendants.                 )
    ───────────────────────────────── )

18

19

20        COMES NOW Plaintiff BRIAN SETENCICH and alleges as follows:

21                        **BACKGROUND**

22        1.      This action is for damages and equitable relief and is brought pursuant to the Fair

23  Employment and Housing Act, California Government Code sections 12920 et seq., related statutes, and

24  California common law.

25        2.      Plaintiff BRIAN SETENCICH ("Setencich") was recruited by defendants to work as the

26  Communication Manager for the Blood Services, Western Region, Division of THE AMERICAN RED

27  CROSS because of Setencich's excellent communication skills and extensive experience of working

28  with the public. He was a perfect fit and filled an important need for Defendants. He would be working

                                    1
    ─────────────────────────────────────────────────────────
        FIRST AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION

1   directly for Marc Jackson ("Jackson"), the Director of Public Affairs and Communications for THE

2   AMERICAN RED CROSS.

3       3.       Jackson, as the director of Public Affairs and Communications, since 1997, has won a

4   multitude of national awards for the work that he has performed for the defendants. When defendants

5   learned of Jackson's condition of psoriatic arthritis, which is a chronic condition protected under the

6   Fair Employment and Housing Act ("FEHA"), it has discriminated against him, denied reasonable

7   accommodation and are attempting to force him into quitting. In addition, defendants began retaliating

8   against Jackson because of his protected activities, including protesting the illegal conduct of the

9   defendants.

10      4.       Defendant THE AMERICAN RED CROSS is a non-profit corporation, authorized to do

11   business in the State of California.

12      5.       Defendant STEVE BROWN ("Brown") is currently the Vice President of the Western

13   Region for Defendants. Defendant ROBERT BROWNING ("Browning") is the Director of Human

14   Resources for Defendants.

15      6.       The association between Jackson and Setencich began in the early 1990's when Setencich

16   was on the Fresno City counsel and Jackson was the Director of Public Relations and Editor in Chief

17   for the Metro News. The two worked on several issues together, and learned that they worked well

18   together. Thereafter, in 1994, Setencich was elected State Assembly for the 30th District and made

19   Jackson his Chief of Staff.

20      7.       In 1997, Setencich became Special Liaison to the Mayor of San Francisco and Jackson

21   began working for Defendants in Southern California.

22      8.       Each Defendant had a discriminating animus against Jackson because of his disability,

23   and protected activity, and developed a discriminatory animus against Setencich when they learned of

24   his association with Jackson.

25      9.       The true names and capacities of the Defendants named herein as DOES 1 through 30,

26   inclusive, whether individual, corporate, associate or otherwise, are unknown to plaintiff who therefore

27   sues such Defendants by fictitious names. Plaintiff is informed and believes that the DOE Defendants

28   are responsible in some manner for the occurrences herein alleged and that Plaintiff's injuries were

2

FIRST AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION

1    proximately caused by the aforesaid Defendants. Plaintiffs will amend this complaint to show such true

2    names and capacities when they have been determined.

3         10.    Plaintiff is informed and believes, and thereby alleges that each of the Defendants herein

4    was at all times relevant hereto the agent, employee or representative and or joint venturer of the

5    remaining Defendants, and was acting at least in part within the course and scope of such relationship.

6    Plaintiffs are further informed and believes, and thereon alleges, that each of the Defendants herein gave

7    consent to, ratified, and authorized the acts alleged herein to each of the remaining Defendants.

8         11.    Plaintiff alleges on information and belief that, at all times relevant herein, Defendants,

9    and each of them, have actively participated in the fraud, misrepresentation against plaintiff because of

10   his association with Jackson, who has a disability under FEHA and who has been subjected to

11   discrimination with his disability as a motivating factor.

12        12.    Plaintiff perfected his right to sue by filing a claim with the Department of Fair

13   Employment and Housing.

### FIRST CLAIM FOR RELIEF

**Association Discrimination**

16        13.    Setencich realleges and incorporates herein the allegations in paragraphs 1 through 12

17   as set forth above.

18        14.    Setencich was recruited beginning in mid to late 2005 by Defendants, given his legislative

19   and communication qualifications and met with hiring decision-makers.

20        15.    Plaintiff interviewed and met with decision-maker's on approximately three occasions.

21   He received positive reviews from the hiring panel and decision-makers. The decision was made to hire

22   Setencich. However, when defendants learned of Setencich's association with Jackson, who they were

23   attempting to force out given his use of family medical leave, disability, and protected activity, they

24   attempted to withdraw the decision.

25        16.    Jackson needed the assistance of a Communication Manager to accommodate not only

26   his disability, but the growth of the department and to counter the attempts of the defendants to

27   undermine him and set him up to fail. Jackson found plaintiff to be the most qualified for the position,

28   as did those on the hiring panel.

3

---

17.    Once Defendants, and each of them, learned that Marc Jackson wanted to hire plaintiff, they withdrew their support because of their discriminatory and retaliatory animus against Jackson. Defendants articulated a pretextural reason for not hiring Setencich.

18.    Defendants, and each of them, took adverse actions against Plaintiff, including but not limited to fraud, failure to hire although qualified, and giving pretextural reasons for the decision not to hire with plaintiff's association with Jackson as a motivating factor.

19.    As a result of the aforementioned conduct alleged herein, Plaintiff has suffered, and continues to suffer, humiliation, anxiety, mental anguish, emotional distress and lost wages in earning capacity.

20.    Defendants' willful and knowing failure discrimination of Plaintiff are outrageous and beyond the scope of conduct which should be tolerated by citizens in a civilized society.

21.    As a proximate result of Defendants' wilful, intentional and malicious conduct, Plaintiff suffered and continues to suffer extreme mental and emotional distress. Plaintiff therefore is entitled to an award of general damages and punitive damages against the Defendants.

22.    Plaintiff has suffered and continues to suffer irreparable and other injury as a direct and legal result of the actions of Defendants, including severe anxiety, physical ailments directly attributable to stress and other emotion trauma.

WHEREFORE, Plaintiff prays for judgment as specifically set forth below.

## SECOND CLAIM FOR RELIEF

### Fraud

23.    The Plaintiff incorporates by reference the allegations in paragraph 1 through 22, as though set forth fully herein.

24.    Defendants made specific representations that it intended to hire Plaintiff which brought plaintiff down to Southern California on three occasions. During Plaintiff's first visit, he informed defendants that he had been convicted of filing a false tax return in 1997 where he failed to pay taxes on a stock dividend from TCBY Yogurt with tax consequences of less than $10,000.00. Defendants informed Setencich that a criminal conviction is not an impediment to being hired and that numerous individuals with convictions had been hired in the past.

4

---

25.     Specifically, in June, 2005, the Human Resource Representative who reviewed Setencich's application and written statement describing the criminal conviction informed Sentencich that the conviction would not stop his hire.  In late 2005, Defendant Brown took Setencich aside, put his arm around him and told Setencich they had worked with people with criminal backgrounds before; they liked to give people second chances; they hire people for what they can bring to the table; and they wanted to hire Plaintiff.  Brown reiterated this to Plaintiff in approximately March, 2006.  Browning also told Plaintiff that his criminal background would not impede his hire.   These statements were republished to Setencich and others, confirming he would be hired, until approximately the summer of 2006.

26.     However, Defendants knew their statements were false at the time they were made. Defendants, and each of them, decided not to hire Plaintiff for their own illegal reasons, and instead hired other employees with felony convictions and even used them for their ads and campaigns.

27.     Sentencich reasonably relied on the representations of Brown, Browning and Human Resources and did not discover the fraud until approximately September, 2006.

28.     As a direct and proximate result of the conduct of Defendants, and each of them, Plaintiff continued to visit Defendants and did not look for other employment.  Plaintiff has incurred and will continue to incur special damages, including, but not necessarily limited to lost wages and salary, lost stock options and bonuses lost benefits, lost future earnings and benefits, medical costs and expenses all in an amount to be determined according to proof at trial.

29.     As a further, direct and proximate result of the conduct of Defendants, and each of them, Plaintiff has suffered and will continue to suffer general damages, including severe emotional distress, without limitation in an amount to be determined according to proof at trial.

30.     The conduct of the Defendants, and each of them, as herein alleged, was malicious, wilful, oppressive, was despicable conduct which constituted wilful, malicious, oppressive conduct on the part of the Defendants, and each of them, which justify an award of exemplary and punitive damages against these Defendants, and each of them, in an amount according to proof at trial or, in a sum sufficient to deter Defendants from such conduct in the future.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth below.

5

### THIRD CLAIM FOR RELIEF

#### Negligent Misrepresentation

31.    Plaintiff realleges and incorporates herein the allegations in paragraphs 1 through 30, as though set forth fully herein.

32.    Defendants' representations as relied from above, including plaintiff being told he was to be hired, where plaintiff lost income, not only in travel and time, but made it so he was unable to secure other employment.

33.    Defendants' actions were negligent and not in good faith.

34.    As a direct and proximate result of the conduct of Defendants, and each of them, Plaintiff has incurred and will continue to incur special damages, including, but not necessarily limited to lost wages and salary, lost stock options and bonuses lost benefits, lost future earnings and benefits, medical costs and expenses all in an amount to be determined according to proof at trial.

35.    The conduct of the Defendants, and each of them, as herein alleged, was malicious, wilful, oppressive, was despicable conduct which constituted wilful, malicious, oppressive conduct on the part of the Defendants, and each of them, which justify an award of exemplary and punitive damages against these Defendants, and each of them, in an amount according to proof at trial or, in a sum sufficient to deter Defendants from such conduct in the future.

36.    As a result of the aforementioned conduct alleged herein, Plaintiff has suffered, and continues to suffer, humiliation, anxiety, mental anguish, emotional distress and lost wages in earning capacity.

WHEREFORE, Plaintiff prays for judgment as hereinafter set forth below.

### PRAYER

1.    Award Plaintiff compensatory damages, according to proof, for lost wages, medical and psychiatric care expenses and pain and suffering;

2.    Prejudgment interest;

3.    Reasonable attorneys' fees;

4.    Reasonable costs of suit;

5.    For punitive damages; and

6

6.     For any other relief that the Court deems just and proper.

Dated: November 8, 2007

**LAW OFFICES OF JILL P. TELFER**
A Professional Corporation

/s/ Jill P. Telfer

_____

**JILL P. TELFER**
Attorney for Plaintiff BRIAN SETENCICH

7

1

**PROOF OF SERVICE**

2  CASE:         Setencich v. The American Red Cross, et al.
   COURT:        USDC, Northern District, Oakland Division
3  CASE NO.      C 07-03688 SBA

4

5       I declare that I am a citizen of the United States, that I have attained the age of majority, and that
   I am not a party to this action. My business address is 331 J Street, Sacramento, CA 95814. I am
6  familiar with this firm's practice of collection and processing of correspondence to be deposited for
   delivery via the U.S. Postal Service as well as other methods used for delivery of correspondence. On
7  the below stated date, in the manner indicated, I caused the foregoing document(s) entitled:

8       **FIRST AMENDED COMPLAINT FOR EMPLOYMENT DISCRIMINATION**

9  to be served on the party(ies) or their (its) attorney(s) of record in this action by:

10      [ ]     Facsimile transmission to the number(s) underline{noted below}.

11      [x]     Placing a true copy thereof in a sealed envelope with postage thereon fully prepaid in the
                designated area for outgoing mail and addressed as indicated below. Said documents
12              will be deposited with the U.S. Postal Service at Sacramento, California on this date in
                the ordinary course of business. I understand that upon motion of a party served service
13              shall be assumed invalid if the postal cancellation date or postage meter date on the
                envelope is more than one (1) day after the date of deposit for mailing as contained in
14              this declaration.

15      [ ]     Hand-delivery addressed to:

16              **Sabrina L. Shadi, Esq.**
                **BAKER & HOSTETLER**
17              **12100 Wilshire Boulevard, 15th Floor**
                **Los Angeles, California 90025-7120**

18

19      I declare under penalty of perjury that the foregoing is true and correct. Executed on November
   8, 2007, at Sacramento, California.

20

21                                           /s/ Tricia Lenox

22                                           TRICIA LENOX

23

24

25

26

27

28

**Complaints and Other Initiating Documents**
4:07-cv-03688-SBA Setencich v. The American Red Cross et al
ADRMOP, E-Filing

U.S. District Court
Northern District of California
**Notice of Electronic Filing or Other Case Activity**

NOTE: Please read this entire notice before calling the Help Desk. If you have questions, please email the Help Desk by replying to this message; include your question or comment along with the original text.

Please note that these Notices are sent for all cases in the system when any case activity occurs, regardless of whether the case is designated for e-filing or not, or whether the activity is the filing of an electronic document or not.

If there are **two** hyperlinks below, the first will lead to the docket and the second will lead to an e-filed document.
*If there is no second hyperlink, there is no electronic document available* .
See the FAQ posting 'I have a Notice of Electronic Filing that was e-mailed to me but there's no hyperlink...' on the ECF home page at for more information.

The following transaction was received from by Telfer, Jill entered on 11/8/2007 2:01 PM PST and filed on 11/8/2007
**Case Name:**        Setencich v. The American Red Cross et al
**Case Number:**      4:07-cv-3688
**Filer:**            Brian Setencich
**Document Number:** 28

**Docket Text:**
AMENDED COMPLAINT against Brian Setencich. Filed byBrian Setencich. (Telfer, Jill) (Filed on 11/8/2007)

**4:07-cv-3688 Notice has been electronically mailed to:**

Ronald Joel Klepetar    rklepetar@bakerlaw.com, ssuzuki@bakerlaw.com

Sabrina Layne Youdim Shadi    sshadi@bakerlaw.com

Jill Patricia Telfer    jilltelfer@yahoo.com

**4:07-cv-3688 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**\\Jill\data\1A ACTIVE CASES\SETENCICH\pleading\amended federal complaint.pdf
**Electronic document Stamp:**
[STAMP CANDStamp_ID=977336130 [Date=11/8/2007] [FileNumber=3899477-0]
[8dda756ca841a19f42e6fa623cdd0ad00ee69ed4c6bf730571c40a64388bee51599f4
34b0b942a9c1d7f228f8fb43d83fa485d62d03972b660b32e1f95a025e9]]

EXHIBIT 2

1   RONALD J. KLEPETAR, Bar No. 52535
    SABRINA L. SHADI, Bar No. 205405
2   BAKER & HOSTETLER LLP
    12100 Wilshire Boulevard, 15th Floor
3   Los Angeles, CA 90025-7120
    Telephone:    310.820.8800
4   Facsimile:    310.820.8859
    Email:    rklepetar@bakerlaw.com
5   Email:    sshadi@bakerlaw.com

6   Attorneys for Defendants
    AMERICAN RED CROSS BLOOD
7   SERVICES SOUTHERN CALIFORNIA
    REGION, Improperly Sued As The American
8   Red Cross and STEVE BROWN

9                UNITED STATES DISTRICT COURT

10             NORTHERN DISTRICT OF CALIFORNIA

11

12  BRIAN SETENCICH,                    Case No.  C07-03688 SBA

13              Plaintiff,              [Honorable Saundra B. Armstrong,
                                        Department 3]
14       v.
                                        **DEFENDANT AMERICAN RED CROSS**
15  THE AMERICAN RED CROSS, a non-      **BLOOD SERVICES SOUTHERN**
    profit corporation, STEVE BROWN,    **CALIFORNIA REGION'S ANSWER TO**
16  ROBERT BROWNING and DOES 1          **BRIAN SETENCICH'S FIRST AMENDED**
    through 30, inclusive,              **COMPLAINT**
17
                Defendants.            Complaint Filed:  March 13, 2007
18                                      First Amended Complaint Filed:  November 8,
                                        2007
19                                      Trial:  None

20

21

22       Defendant American Red Cross Blood Services Southern California Region, improperly

23  Sued as The American Red Cross ("ARC'"), answers and responds to plaintiff Brian Setencich's

24  ("Setencich") First Amended Complaint as follows:

25  / / /

26  / / /

27  / / /

28  / / /

077975, 000039, 501569456.1                - 1 -

AMERICAN RED CROSS' ANSWER TO BRIAN SETENCICH'S FIRST AMENDED COMPLAINT

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

RECEIVED
MAR 2 6 2008
By

1.      Answering paragraph 1, because paragraph 1 is a statement regarding the relief sought by Setencich and the statutes upon which he has relied in bringing this action, ARC can neither admit nor deny the allegations of this paragraph.

2.      Answering paragraph 2, ARC is informed and believes that Marc Jackson ("Jackson"), the Director of Communications and Marketing for American Red Cross Blood Services Southern California Region/West Division invited Setencich to apply for the position of Communication Manager and that, if hired, Setencich would have been working directly for Jackson. ARC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, accordingly, denies each such allegation.

3.      Answering paragraph 3, ARC is informed and believes that since 1997, Jackson, along with his staff in the Communications and Marketing Department, has won national awards related to work they have performed for ARC. Except as expressly admitted or stated on information and belief, ARC denies the allegations in this paragraph.

4.      Answering paragraph 4, ARC admits the allegations of this paragraph.

5.      Answering paragraph 5, ARC denies the allegations of this paragraph.

6.      Answering paragraph 6, ARC is informed and believes that Jackson and Setencich met in the early 1990's. ARC is further informed and believes that Setencich made Jackson his Chief of Staff when Setencich was elected to the State Assembly in 1994. ARC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, accordingly, denies each such allegation.

7.      Answering paragraph 7, ARC admits that Jackson began working for ARC in 1997. ARC lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph and, accordingly, denies each such allegation.

8.      Answering paragraph 8, ARC denies the allegations in this paragraph.

9.      Answering paragraph 9, ARC lacks knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph and, accordingly, denies each such allegation in this paragraph.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

1    10.   Answering paragraph 10, ARC lacks knowledge or information sufficient to form

2   a belief as to the truth of the allegations of this paragraph and, accordingly, denies each such

3   allegation in this paragraph.

4    11.   Answering paragraph 11, ARC denies the allegations in this paragraph.

5    12.   Answering paragraph 12, the records maintained by the Department of Fair

6   Employment and Housing speak for themselves.

7   <u>COUNT I</u>

8   **ASSOCIATION DISCRIMINATION**

9    13.   ARC realleges and incorporates by reference its answers contained in paragraphs 1

10   through 12 of the first amended complaint.

11    14.   Answering paragraph 14, ARC is informed and believes that Jackson invited

12   Setencich to apply for the position of Communication Manager in or around June of 2005.  ARC

13   is also informed and believes that Setencich met with certain ARC employees.  ARC lacks

14   knowledge or information sufficient to form a belief as to the truth of the remaining allegations of

15   this paragraph and, accordingly, denies each such allegation.

16    15.   Answering paragraph 15, ARC is informed and believes that Jackson met with

17   certain ARC employees.  Except as stated on information and belief, ARC denies the allegations

18   in this paragraph.

19    16.   Answering paragraph 16, ARC denies the allegations of this paragraph.

20    17.   Answering paragraph 17, ARC denies the allegations of this paragraph.

21    18.   Answering paragraph 18, ARC denies the allegations in this paragraph.

22    19.   Answering paragraph 19, ARC denies the allegations in this paragraph.

23    20.   Answering paragraph 20, ARC denies the allegations in this paragraph.

24    21.   Answering paragraph 21, ARC denies the allegations in this paragraph.

25    22.   Answering paragraph 22, ARC denies the allegations in this paragraph.

26   / / /

27   / / /

28   / / /

077975, 000039, 501569456.1

- 3 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## COUNT II

### FRAUD

23.    ARC realleges and incorporates by reference its answers contained in paragraph 1 through 22 of the first amended complaint.

24.    Answering paragraph 24, pursuant to the Court's Order dated February 14, 2008, the claim for Fraud has been dismissed as to all defendants.

25.    Answering paragraph 25, pursuant to the Court's Order dated February 14, 2008, the claim for Fraud has been dismissed as to all defendants.

26.    Answering paragraph 26, pursuant to the Court's Order dated February 14, 2008, the claim for Fraud has been dismissed as to all defendants.

27.    Answering paragraph 27, pursuant to the Court's Order dated February 14, 2008, the claim for Fraud has been dismissed as to all defendants.

28.    Answering paragraph 28, pursuant to the Court's Order dated February 14, 2008, the claim for Fraud has been dismissed as to all defendants.

29.    Answering paragraph 29, pursuant to the Court's Order dated February 14, 2008, the claim for Fraud has been dismissed as to all defendants.

30.    Answering paragraph 30, pursuant to the Court's Order dated February 14, 2008, the claim for Fraud has been dismissed as to all defendants.

## COUNT III

### NEGLIGENT MISREPRESENTATION

31.    ARC realleges and incorporates by reference its answers contained in paragraphs 1 through 30 of the first amended complaint.

32.    Answering paragraph 32, ARC denies the allegations in this paragraph.

33.    Answering paragraph 33, ARC denies the allegations in this paragraph.

34.    Answering paragraph 34, ARC denies the allegations in this paragraph.

35.    Answering paragraph 35, ARC denies the allegations in this paragraph.

36.    Answering paragraph 36, ARC denies the allegations in this paragraph.

37.    ARC alleges the following as affirmative defenses:

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Cause of Action)

38.     Setencich's claims are barred by his failure to state facts sufficient to constitute a cause of action.

## SECOND AFFIRMATIVE DEFENSE

### (No Grounds for Punitive Damages)

39.     ARC is not guilty of malice, fraud or oppression against Setencich, and therefore, he is not entitled to punitive damages.

## THIRD AFFIRMATIVE DEFENSE

### (Failure to Mitigate Damages)

40.     If Setencich has suffered any injuries as alleged in the first amended complaint or otherwise, which ARC denies, then Setencich has failed to take reasonable steps to mitigate his alleged damages and any recovery in this action should be reduced to the extent that he failed to mitigate his damages.

## FOURTH AFFIRMATIVE DEFENSE

### (No Justifiable Reliance)

41.     Setencich's causes of action based on alleged misrepresentation by ARC are barred because Setencich could not have justifiably or reasonably relied thereon.

## FIFTH AFFIRMATIVE DEFENSE

### (No Emotional Distress Damages)

42.     ARC's actions with respect to Setencich was neither extreme nor outrageous, and therefore, Setencich is not entitled to damages for emotional distress

## SIXTH AFFIRMATIVE DEFENSE

### (No Misrepresentation of Fact)

43.     Setencich's causes of action based on alleged misrepresentations by ARC are barred because ARC did not make any misrepresentation of fact.

/ / /

/ / /

077975, 000039, 501569456.1

- 5 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

### SEVENTH AFFIRMATIVE DEFENSE

#### (Proper Exercise of Employer's Discretion)

44.    Any and all conduct of which Setencich complains and which is attributed to ARC was a just and proper exercise of management discretion on the part of ARC, undertaken for an honest, proper reason and regulated by good faith under the circumstances then existing.

### EIGHTH AFFIRMATIVE DEFENSE

#### (Business Necessity)

45.    Any and all conduct of which Setencich complains and which is attributed to ARC was accomplished for and conducted due to legitimate and good faith business necessity.

### NINTH AFFIRMATIVE DEFENSE

#### (Statutes of Limitation)

46.    The First Amended Complaint, and each and every purported cause of action alleged therein, is barred by the applicable statutes of limitations, including those set forth in California Code of Civil Procedure Sections 337, 338, 339 or 340 and Government Code Sections 129609 and 12965(b).

### TENTH AFFIRMATIVE DEFENSE

#### (Reservation of Further Defenses)

47.    ARC hereby reserves the right to amend this pleading to include further affirmative defenses.

**WHEREFORE,** prays for judgment as follows:

1.    That Setencich takes nothing by reason of the first amended complaint;

2.    That Setencich's first amended complaint be dismissed with prejudice;

3.    That judgment be rendered in favor of ARC;

4.    That ARC be awarded costs of suit;

5.    That ARC be awarded reasonable attorneys' fees; and

/ / /

/ / /

/ / /

077975, 000039, 501569456.1

- 6 -

6.    For such other and further relief as this Court may deem just and proper.

Dated:  March 26, 2008

BAKER & HOSTETLER LLP


/s/ Sabrina L. Shadi
RONALD J. KLEPETAR
SABRINA L. SHADI
Attorneys for Defendants
AMERICAN RED CROSS BLOOD
SERVICES SOUTHERN CALIFORNIA
REGION and STEVE BROWN

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

077975, 000039, 501569456.1

- 7 -

AMERICAN RED CROSS' ANSWER TO BRIAN SETENCICH'S FIRST AMENDED COMPLAINT

1

## PROOF OF SERVICE

2

3        I am employed in Los Angeles County, California.  I am over the age of eighteen years
and not a party to the within-entitled action.  My business address is 12100 Wilshire Boulevard,
4    15th Floor, Los Angeles, California  90025-7120.  On March 26, 2008, I served a copy of the
within document(s): **DEFENDANT AMERICAN RED CROSS BLOOD SERVICES**
5    **SOUTHERN CALIFORNIA REGION'S ANSWER TO BRIAN SETENCICH'S FIRST**
**AMENDED COMPLAINT**

6

7    ☒        via electronic mail by the U.S. District Court—Live System.

8    ☐        by transmitting via facsimile the document(s) listed above to the fax number(s) set
forth below on this date before 5:00 p.m. and the transmission was reported as
9            complete and without error.

10

11   ☐        by placing the document(s) listed above in a sealed envelope with postage thereon
fully prepaid, in the United States mail at Los Angeles, California addressed as set
forth below.

12

13   ☐        by personally delivering the document(s) listed above to the person(s) at the
address(es) set forth below.

14

15   Jill P. Telfer, Esq.
LAW OFFICES OF JILL P. TELFER
16   A Professional Corporation
331 J Street, Suite 200
17   Sacramento, CA 95814
Phone: (916) 446-1916
18   Fax: (916) 446-1726
Email: jilltelfer@yahoo.com

19

20       I am readily familiar with the firm's practice of collection and processing correspondence
for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same
21   day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on
motion of the party served, service is presumed invalid if postal cancellation date or postage
22   meter date is more than one day after date of deposit for mailing in affidavit.

23       I declare that I am employed in the office of a member of the bar of this court whose
direction the service was made.
24

25       Executed on March 26, 2008, at Los Angeles, California.

26
                                            /s/ Charlene E. Stamps
27                                          _____
                                            CHARLENE E. STAMPS
28

077975, 000039, 501569456.1

PROOF OF SERVICE

EXHIBIT 3



Mail.com the best personalized free web-based email                                    03/24/2007 12:41 PM



**Em@il.com**    Please type your search   ( Search the Web )                    ??? Help

EMAIL ▾ | ADDRESSES ▾ | CALENDAR ▾ | NOTEPAD ▾ | PREMIUM ▾ | GAMES | CARDS | FORUM | PERSONALS | VIDEO | BLOG | CHAT

( Check Mail )  ( Compose )  ( Folders )          **Download Mail Alert** ▣          ☺          ▤

New feature!         1. Select language:  ( Auto Detect ⇕ )   **Podmail:** save an    Click here
AUDIO WEBMAIL                                                audio file to your PC    to
Listen to this email  2. ( Listen )                          or portable media        comment
                                                             player ( Download )       on Audio
Powered by ReadSpeaker                                                                 Webmail.

**Read Message**          Printable Version / Print with annotation        Previous | Next

(📩) ( Reply ) ( Reply All ) ( Forward ) ( Inline Text ⇕ ) ( Add annotation )     ( Move To )
( Delete )

From: JackMarc@usa.redcross.org   Save Address  Block Sender  This
Is Spam

To: <marcjackson@mail.com>
CC:
Subject: FW: Meeting Recap
Date: Fri, 9 Sep 2005 13:49:00 -0700

**Show Full Headers**                                                      **Back To [INBOX]**

-----Original Message-----
From: Jackson, Marc
Sent: Friday, September 09, 2005 1:32 PM
To: Brown, Stephen (WCBU - VP)
Subject: Meeting Recap

Thanks, Steve.

The working accommodations we agreed upon are appreciated. As you mention, it is extremely
important to fill Julie's old position for the reasons we discussed. I appreciate that you are willing to
give Brian Setenich a fair opportunity. I am confident that he would work well with both Stephen
and Charlie. I think you will be impressed.

Stephen has done an amazing job and I know that you will show your appreciation. He has truly
gone the extra mile.

As discussed, I strongly support all material that has system-wide application being sent to other
Divisions under your signature. Currently, as you know, there is a moratorium where we cannot

Mail.com the best personalized free web-based email     03/24/2007 12:41 P7

charge other Regions or Divisions for our services. Therefore, we invite other Divisions to purchase our products directly from our vendor. They are given the price that the So Cal Region would be charged if it were the only buyer. However, these additional purchases by other Divisions do result in volume buying discounts and our vendor has agreed to give all of those savings to the West Division in the form of credits because of the increased business we are bringing them. In August, these credits amounted to $3,000 in savings to the West Division.

I don't foresee a problem with media relations between the Region and the Division. As I see it, virtually all media inquiries would be handled on the Regional level. Of course, the Division would be in daily contact with the Region to provide background and counsel when necessary or requested, but messaging should be tailored to the community and approved on the Regional level. The Division would ensure that messaging is within the acceptable parameters established by BHQ.

Under consolidation, you mention that Spanish translations would be a Divisional responsibility. The Hispanic media specialist, Hector Calderon, will be returning soon (9/19/05) from an educational sabbatical in London. I would suggest that he report to the Region since the position involves extensive Spanish language media relations. He also works closely with Rudy Salinas in DRD to develop strategic partnerships. I would suggest that this position report to Stephen since Stephen is bilingual and Stephen, Rudy, and the Los Angeles Chapter are currently in the process of finalizing a deal with Telemundo. Stephen and I would coordinate translation efforts as needed.

As discussed, the Division Communications Department will primarily focus on communicating and advancing the "big picture" strategic priorities you establish that may have the potential for system-wide application while supporting the recruitment marketing functions of the Region.

-----Original Message-----
From: Sjljrjpj@aol.com [mailto:Sjljrjpj@aol.com]
Sent: Friday, September 09, 2005 7:13 AM
To: Jackson, Marc
Subject: Meeting Recap

Marc, the following is a recap of our meeting last Wednesday afternoon:

- The working accomodation during your recovery is that approximately 60% of your time will be spent in the office (either Culver City or Pomona) and approximately 40% at home.

- We will need to move to fill Julie's position which I will get the ball rolling next week.

- I will meet with Brian Sepencich (sp?) for a brief interview.  Will also review current ARC policy. No promises but do want to give this a fair shake.

- Thanks for resuming the Daily Briefing Service.

- I need to be sure we give adequate recognition to Stephen Whitburn to show our appreciation for the work he has been doing.

- We need to establish some guidelines on how we are going to support the other Divisions with the materials we develop within the West Division. I think we are in agreement that keeping me in the loop and issuing communication to the other Divisions under my signature could increase the use of our services.

- In the development of ideas, programs, projects, materials I ask that you keep me updated as well as get my approval before we incur costs. Very important as you aptly pointed out "no department budget information has ever been provided to you" so having my approval for expenditures assures everyone we are operating with fiscal responsibility.

MJ116

Mail:com the best personalized free web-based email                                                             03/24/2007 12:41 PM

- There will be a Division Communications Department that will be responsible/report to me as the Division Vice President. The Director position will have to be "acting" as under current requirements the position has to be "posted" versus "appointed" plus selection of DVP direct reports have to be approved by the Senior Vice President, Don Dudley.

- With input I will need to define the roles and responsibilities of the Division Communications Director. One challenge we have is in relationship to the Region based public relations staff that report directly the Region CEOs and the Communications Director. I think the concern here from the CEOs is that they won't be treated as customers and have their local needs met regarding interaction with local media, community and chapter realtions. We'll discuss this further next week.

- In the area of donor recruitment (collections, hospital services, sales) Jack McGuire continues hammer home the point that this is a direct responsibility of Region CEOs who will be held accountable for getting collection targets achieved. The pressure is on and the CEOs are feeling it - in fact several did not get raises due to collection performance in FY05. Therefore, within the West Division, we must be sensitive to this pressure and need to understand that the CEOs as a group (with input from their respective staff) expect to have involvement in all decisions related to recruitment. This DRD initiatives, recruitment campaigns, promotions, etc., will have some consolidation and will have centralized oversight but driven by consensus of the Region CEOs.

- Consolidation activities at the Division level include recruitment campaigns (decided by Regions), recruitment brochures, recruitment collateral materials, donor information brochures and forms, employee/hospital/donor/sponsor/volunteer newsletter templates customized for Region specific information, printing services, video development and production, print/television/radio/billboard advertising (requires DVP and SVP approval), graphic design, photography and photo library, spanish translations, news briefings, grant writing and Point of Contact (POC) for the Division to NHQ communications/public relations.

- We will need to clearly establish guidelines as to how the process between the Regions and the Division will function related to centralized communications, public affairs, media relations and media relations training, public relations, chapter communications, hospital communications, etc. The public affairs person is already established in the Arizona Region and the Northern California Region. There is an assumption by Charlie Wilcox that his Region public affairs person in San Diego will be Stephen Whitburn and will want a designated Region public affairs person for Pomona/LA. Keep in mind these positions currently report to the Region CEO and will have dotted lines to the Communications Director. Therefore, our challenge is to bring clarity on how this is going to work now that all media inquiries comes to you along with how are we going to draw the line between the SoCal Region responsibilities and the Division responsibilites when housed within the same building - need your thought process on this.

- Finally we need to have further discussion on how the Division Communications Department is going to operate to address the various functions, tasks, and activities assigned to the department.

Marc, I may have missed some points which we can cover when we get together next week to begin to move forward on many of these items outlined above. I appreciate your creative talent and the work the you do. I know you will work with me as we make this transition and I know you recognize the need to be very customer oriented to our internal staff. It has been unsettling for everyone and hopefully we are going to be able to put in place processes that assists everyone in their jobs as we move to the Divison business model.

Take care and have a great weekend.

Steve Brown
Division Vice President

Reply   Reply All   Forward          Move To    :   Previous | Next | Back

MJ117

EXHIBIT 4

Marc Jackson                          January 30, 2008

Page 114

1   politically motivated conviction?
2         MS. SHADI:  Objection, assumes facts not
3   in evidence.
4         THE WITNESS:  Yes, I just didn't think
5   it was consistent.  Didn't understand it.
6   BY MS. TELFER:
7     Q.  And in regards to Mr. Setencich's
8   criminal conviction, was it your understanding
9   that he ended up being convicted of filing a
10  false tax return that was under $10,000?
11    A.  Yes.
12    Q.  And have you learned that individuals
13  that usually aren't even convicted of such a
14  crime is usually a civil penalty and not a
15  criminal one?
16    A.  Yes.
17    Q.  Are you aware of any -- strike that.
18        So is it correct that sometime after
19  July 1st, 2005, this prior CEO was rehired as a
20  nurse?
21        MS. SHADI:  Asked and answered.
22        MS. TELFER:  I didn't ask the date.
23    Q.  But it was after July 2005?
24    A.  Can I see what you're referencing?
25    Q.  I'm sorry.

Marc Jackson                          January 30, 2008

Page 115

1     A.  Yes.
2     Q.  And that individual was rehired to work
3   in the southern California region?
4     A.  Yes.
5     Q.  So based on your experience of working
6   in that region, is it your understanding that
7   that hire would have been approved by Charlie
8   Wilcox and Steve Brown, if you know?
9     A.  It would have to be approved by -- I
10  don't know.  I have no idea.  That I don't know.
11  I don't know.  It could have to be -- it
12  depends -- I don't know.
13    Q.  So after July 1st of 2005, did you meet
14  at all with Mr. Brown to discuss reconsidering
15  his position on Mr. Setencich?
16    A.  I talked to him briefly.  I know Steven
17  Wittburn talked to him at length, because Steven
18  would be handling the media aspects of it, and
19  Steven thought, you know, hey, there's more of an
20  issue here about, you know, definitely hiring,
21  you know, Miss Turner, rather than, you know,
22  because people are more sympathetic to, you know,
23  an erroneous tax return, you know, in most
24  peoples' opinion than a DUI, especially a heroin
25  conviction.  At least that was the opinion that

Marc Jackson                          January 30, 2008

Page 116

1   we had.
2     Q.  Just for the record then, because I've
3   seen this in the news media anyway, but the
4   individual that had been a CEO that was rehired
5   as a nurse after 2005, that was Miss Turner?
6     A.  Correct.
7     Q.  I have marked as Exhibit 22, if I locate
8   it, a two-page document, Bates stamped MJ102 to
9   103 and again these are some e-mails, and I just
10  want to get them authenticated.  I believe these
11  e-mails concern your being question on $7.52 on
12  an expense report.
13        (Exhibit No. 22 marked for identification.)
14  BY MS. TELFER:
15    Q.  I just want to establish for the record,
16  do you remember receiving e-mails questioning a
17  receipt that you submitted for $7.52?
18    A.  Yes.
19    Q.  As of July 2005 did you feel that your
20  expense reports were being scrutinized?
21    A.  Everything I did was scrutinized.
22    Q.  And this is just one example?
23    A.  Well, yeah, to me what was more, you see
24  in the e-mail above, was I had no staff.  And
25  so my kids and I had to work until 2:00 o'clock

Marc Jackson                          January 30, 2008

Page 117

1   in the morning, getting things ready, and I mean
2   -- and I was sick.  I was absolutely exhausted.
3   I had nowhere to go.
4     Q.  So at this time do you believe American
5   Red Cross was accommodating your medical
6   condition?
7     A.  No.
8     Q.  And did you continue to have concerns
9   that you were being set up to fail?
10    A.  Yes.
11    Q.  Just for the record then Exhibit 22 on
12  the bottom of the page is an e-mail that you sent
13  out, explaining that the $7.52 was in regards to
14  a lunch that you had?
15    A.  Right.
16    Q.  And then the top e-mail you sent to
17  Mr. Dudley?
18    A.  Correct.
19    Q.  And again Mr. Dudley was the senior VP?
20    A.  Correct.
21    Q.  I'm going to mark as Exhibit 23 a
22  document that is a press release, I believe, from
23  the American Red Cross, regarding your -- award
24  for the PR's highest international honor?
25        (Exhibit No. 23 marked for identification.)

e9c1c78c-23c9-4af5-b32a-4482d0771f1f

Marc Jackson                  January 30, 2008

Page 118

1   BY MS. TELFER:
2      Q.  Do you remember that this press release
3   went out in July of -- July 21st, 2005?
4      **A.  Correct.**
5      Q.  Do you know why it took to long since
6   the award was given in the beginning of July?
7      **A.  That's just the way the Red Cross works.**
8      Q.  And again this is in regards to the
9   award that involved the United Nation you talked
10  about earlier?
11     **A.  Right.**
12     Q.  I've marked as Exhibit 24, a one-page
13  documented, dated August 22nd of 2005, Bates
14  stamped MJ107.  And I'm going to just explain it
15  for the record, and please take your time to read
16  it, if you need to.  But is this a letter from
17  the director of human resources, Marlene Zweig,
18  that you received August 22nd, 2005, informing
19  you that the American Red Cross could not longer
20  accommodate your condition by allowing you to
21  work at home?
22     **A.  Correct.**
23     **(Exhibit No. 24 marked for identification.)**
24     MS. SHADI:  Objection, document speaks
25  for itself.

Esquire Deposition Services    520 Capitol Mall Ste. 250    Sacramento, C.A. 95814
Phone (916) 448-0505(800) 610-0505    Fax (916) 448.8726

Marc Jackson                  January 30, 2008

Page 119

1      THE WITNESS:  Yes.  This and -- but, you
2   know, I mean, but you what, you know, you can see
3   like this e-mail right here that I wasn't just
4   working from home.  I was doing, you know, I had
5   my kids and everything doing this stuff, but
6   frankly, when I got done doing stuff that nobody
7   else knew how to do, they just said, you know,
8   this is when I knew, beyond a shadow of a doubt,
9   that I was totally being set up to fail and that
10  because, you know, they say I'm not working, you
11  know, they imply that I'm not working.  Yet they
12  win the highest award in PR for my work, and my
13  kids and I are putting, organizing events for
14  them, you know, but then since those events were
15  done, and they had some lag time, now is the
16  perfect time to, you know, say adios, dude.
17     Q.  As a result did this cause you more
18  stress?
19     **A.  Absolutely.**
20     Q.  And is that because you love your job?
21     **A.  Yes.**
22     Q.  As a result did you respond to the
23  director of human resources' letter informing you
24  that American Red Cross would no longer
25  accommodate you?

Esquire Deposition Services    520 Capitol Mall Ste. 250    Sacramento, C.A. 95814
Phone (916) 448-0505(800) 610-0505    Fax (916) 448.8726

Marc Jackson                  January 30, 2008

Page 120

1      **A.  Yes.**
2      Q.  I'm going to show you a document that
3   I've marked as Exhibit 25.  It's dated August the
4   25th of 2005.
5      **(Exhibit No. 25 marked for identification.)**
6   BY MS. TELFER:
7      Q.  Is this a letter that you sent back to
8   Marlene Zweig?
9      **A.  Yes.**
10     Q.  And did you request that the American
11  Red Cross reconsider and accommodate you?
12     **A.  Yes.**
13     Q.  Did Dr. Peckaral send a letter, if you
14  know?
15     **A.  Yes.**
16     Q.  After yourself and Dr. Peckaral sent a
17  letter asking the American Red Cross to
18  reconsider accommodating your condition, did you
19  eventually have a meeting with Steve Brown?
20     **A.  Yes.**
21     Q.  And who was present at that meeting?
22     **A.  Steve and myself.**
23     Q.  I have marked as Exhibit 26 a four-page
24  document that involves e-mails, but I believe it
25  recaps the meeting.  You look at the second page

Esquire Deposition Services    520 Capitol Mall Ste. 250    Sacramento, C.A. 95814
Phone (916) 448-0505(800) 610-0505    Fax (916) 448.8726

Marc Jackson                  January 30, 2008

Page 121

1   of the exhibit first of all because it's the
2   first e-mail in time.  And it appears to be
3   from some e-mail address that I don't know, but
4   it says "Steve Brown" at the end.  Is the second
5   page and third page of Exhibit 26 an e-mail from
6   Mr. Brown to you?
7      **A.  Yes.**
8      **(Exhibit No. 26 marked for identification.)**
9   BY MS. TELFER:
10     Q.  And did you receive it on September the
11  9th of 2005?
12     **A.  Yes.**
13     Q.  It says "Marc, the following is a recap
14  of our meeting last Wednesday."  Do you recall
15  that the meeting with Mr. Brown was on September
16  the 7th, approximately two days prior to this
17  e-mail?
18     **A.  Yes.**
19     Q.  And during that meeting was
20  accommodating you discussed?
21     **A.  Yes.**
22     Q.  Do you know what prompted the meeting?
23     **A.  I think the letter.  I know that**
24  Dr. Peckaral wrote a letter.  I don't know if
25  Dr. Peckaral called.  Then Dr. Peckaral was

Esquire Deposition Services    520 Capitol Mall Ste. 250    Sacramento, C.A. 95814
Phone (916) 448-0505(800) 610-0505    Fax (916) 448.8726

e9c1c78c-23c9-4af5-b32a-4482d0771f1

Marc Jackson                         January 30, 2008

Page 122

1  pretty upset by this time.
2      Q.  Did he share with you -- he was very
3  concerned over your health?
4      A.  Right.  And I was absolutely thrilled by
5  this.  I was totally thrilled by, you know, this
6  accommodation.
7      Q.  And the accommodation was to allow you
8  to work 60 percent in the office and 40 percent
9  at home?
10     A.  Right.
11     Q.  Did Steve Brown during the meeting say
12 that there would be any limit on this, so this
13 could only go for six months?
14     A.  No, and I assured him, you know, the job
15 would get done, you know, but he didn't mention
16 that, you know, the people who know me I won't
17 let things not get done.
18     Q.  And it also says in this e-mail, "We
19 will need to move to fill Julie's position, which
20 I will get the ball rolling next week."  So
21 during the meeting on September 7th, was filling
22 the communication manager position discussed?
23     A.  Yes.
24     Q.  And did Mr. Brown agree to meet with
25 Mr. Setencich for an interview?

Marc Jackson                         January 30, 2008

Page 123

1      A.  I think so, yes.  Now I'm getting my
2  dates confused, but I'm pretty sure, yes.
3      Q.  If you look at the second page --
4      A.  Yes, this was the second time -- okay,
5  okay, yes, yes.
6      Q.  Do you know how many times Mr. Brown
7  actually met with Bryan Setencich?
8      A.  I think once.
9      Q.  And is it your understanding it was
10 sometime after September 7th, 2005, that
11 Mr. Brown met and interviewed Mr. Setencich?
12     A.  Yes.
13     Q.  And he says "We'll also review current
14 ARC policy."  Do you know what he's referring to
15 in that regard?
16     A.  My guess would be --
17     Q.  I don't want you to guess.  You might
18 not know.
19     A.  I might know, but just the context that
20 I read it into would -- I assume it would be
21 whether the Red Cross policy is regarding, you
22 know, hiring someone with a past felony
23 conviction.
24     Q.  At Mr. Setencich's deposition for the
25 first time the American Red Cross produced a

Marc Jackson                         January 30, 2008

Page 124

1  policy that was -- had a date of 2007, and it
2  said that under certain circumstances an
3  individual with a conviction, if it was in the
4  last so and so years, could not be hired.
5      Let me ask you this as of 2005, had
6  anyone ever shown you a policy, a written policy,
7  that someone with a criminal conviction no matter
8  of the circumstances couldn't be hired?
9      A.  No.
10     Q.  Did Mr. Brown state that he would give
11 Bryan Setencich a fair shake?
12     A.  Yes.
13     Q.  And were you asked to resume the daily
14 briefing service that you had done previous?
15     A.  Yes.
16     Q.  So as of September the 9th, 2005, did
17 you believe that things were going to get better
18 now?
19     A.  Yes.
20     Q.  And were you very relieved that you were
21 going to have a communications manager to assist
22 you?
23     A.  Yes.
24     Q.  Looking at the first page of Exhibit No.
25 26, did you respond back with e-mail at 1:32

Marc Jackson                         January 30, 2008

Page 125

1  P.M.?
2      A.  Yes.
3      Q.  Do you know when after September 9th,
4  2005, Mr. Brown met with Mr. Setencich?
5      A.  I don't remember the exact date, no.
6      Q.  Were you present during that meeting?
7      A.  No.
8      Q.  Did Mr. Setencich share with you what
9  Steve Brown had told him during that meeting?
10     A.  Yes.
11     Q.  What did Mr. Setencich tell you?
12     A.  He said that it was real informal.
13 Steve shook his hand and patted him on the back
14 and told him that he understood that he thought
15 everybody deserved a fair chance, and that he
16 wanted him to talk with Bob Browning, the HR
17 director.
18     Q.  Did Mr. Setencich share with you that he
19 felt as though his interview with Steve Brown
20 went well?
21     A.  Yes.
22     Q.  Did Steve Brown ever report back to you
23 what happened during that interview?
24     A.  No.
25     Q.  Do you know whether or not Mr. Setencich

e9c1c78c-23c9-4af5-b32a-4482d0771f1e

Marc Jackson                     January 30, 2008
                                        Page 126

1   met with Bob Browning?
2      A. Yes.
3      Q. And did you actually set up that meeting
4   or that interview?
5      A. No, either Steve did or his secretary
6   did.
7      Q. And how did you know Mr. Setenich met
8   with Steve Brown -- I'm sorry. How did you know
9   that Mr. Setenich met with Bob Browning?
10     A. Steve told me -- Steve Brown told me
11  that he wanted to -- Steve said that both he --
12  he wanted to meet with Bryan Setenich and he
13  also wanted Bob Browning to interview with --
14     Q. Did he explain to you why he wanted
15  Mr. Setenich to interview with Robert Browning?
16     A. No.
17     Q. As of the time that Steve Brown said
18  that he would meet with Mr. Setenich and
19  interview him, did you believe that Bryan
20  Setenich was the most qualified candidate for
21  the communications manager position?
22     A. Yes.
23         MS. SHADI: Assumes facts not in
24  evidence.
25  BY MS. TELFER:

Marc Jackson                     January 30, 2008
                                        Page 127

1      Q. And did you learn from the panel that
2   they believed that Mr. Setenich was the most
3   qualified candidate?
4      A. Yes.
5      Q. And did Dr. Peckaral share with you that
6   he believed that Mr. Setenich was the most
7   qualified candidate?
8      A. Yes.
9      Q. Did Robert Browning share with you the
10  outcome of his meeting with Bryan Setenich?
11     A. No.
12     Q. Has Robert Browning ever discussed Bryan
13  Setenich with you?
14     A. No.
15     Q. I'm going to show you a document that
16  I've marked as Exhibit 27. It's Bates stamped
17  MJ003 and ask you what this document is?
18     A. Okay. So then after -- September 9th,
19  2005 -- do we know what -- do we know the dates
20  of when Bryan met with Steve and Bob Browning?
21     Q. No, Mr. Setenich didn't know, and the
22  Red Cross hasn't told me yet?
23     (Exhibit No. 27 marked for identification.)
24         MS. SHADI: I'm not sure.
25         THE WITNESS: I kind of think then this

Marc Jackson                     January 30, 2008
                                        Page 128

1   -- what this was, was that then the position
2   just -- it kept on fading into oblivion, this
3   position, okay? And so I think what happened is
4   is that I posted it again, okay? And I was
5   eventually told -- well, where's the e-mail where
6   I was told that it isn't going to happen, that
7   Bryan wasn't to get hired.
8   BY MS. TELFER:
9      Q. I have a February 21st, 2006 e-mail that
10  I'll show you in a minute.
11     A. Okay, so well, anyways this was either
12  filled out to -- because the Bryan thing was kept
13  going on, or because I was eventually told that
14  Bryan wasn't going to be hired, and I wanted to
15  have Steven move into that position, so it was
16  for one of those two reasons, but the position
17  just disappeared.
18     Q. Okay. Do you believe that Exhibit 27
19  was to try to retrigger the process to get it
20  filled?
21     A. Yes.
22     Q. Whether it was going to be Mr. Setenich
23  or Mr. Wittburn?
24     A. Exactly.
25     Q. Was Mr. Setenich your first choice for

Marc Jackson                     January 30, 2008
                                        Page 129

1   the communications manager position in LA or was
2   it Mr. Wittburn?
3      A. Bryan Setencich was the first choice for
4   LA, with Steven Wittburn in San Diego.
5      Q. And looking at Exhibit 27, is that Steve
6   Brown's signature?
7      A. Yes.
8      Q. He filled that position?
9      A. Yes.
10     Q. You were never allowed to fill this
11  position; were you?
12     A. No.
13     Q. I'm going to show what will be marked as
14  Exhibit 28. It's Bates stamped MJ007 through
15  009, and it's identified on the first page
16  "Communications manager position, Posted on
17  February the 10th, 2006.
18         Do you know what this document is for
19  one?
20     A. This was I presume that this -- I don't
21  know who -- unless they had specialist leave
22  around -- this is for the manager's position that
23  was opened, and this was probably just to fill
24  another position where somebody left. I can't
25  think off of my head who left on February 10th,

e9c1c78c-23c9-4af5-b32a-4482d0771f1e

Marc Jackson                    January 30, 2008

Page 142

1  about a bleak financial condition, and I show
2  them how to cut it in half, instead of cutting it
3  in half, they keep the status quo, and so I
4  didn't understand how that addressed the
5  financial situation, you know.
6      Q.  So did you believe that the, for want of
7  a better term, the excuse that it was because of
8  financing that they weren't bringing Mr. Wittburn
9  up to LA was false because they hired Miss
10  Solario?
11     A.  Yeah, I totally believe that because
12  they would be able to -- under my plan they would
13  have been able to eliminate a position, and under
14  Mr. Wilcox's plan, they kept the status quo.  I
15  would have cut expenses, you know, when you
16  consider benefits and everything by what?
17  80-$90,000, and so I don't understand.
18     Q.  I'm going to mark as exhibit next a
19  order several page document, Exhibit 33, several
20  pages Bates stamped MJ164 through 171.  For the
21  record let me know if you need a break.  It's
22  hard going through over -- emotional part to it
23  so, I'm sorry.
24     A.  That's okay.
25     (Exhibit No. 33 marked for identification.)

---

Marc Jackson                    January 30, 2008

Page 143

1  BY MS. TELFER:
2      Q.  Since this was a rather lengthy e-mail,
3  and I know our time is short, if you don't mind?
4  I'm just going to concentrate on one issue on
5  these group of e-mails.  Specifically, on the
6  second page.  Is that an e-mail that you sent to
7  Steve Brown on September the 15th at
8  approximately 5:38 P.M.?
9      A.  Yes.
10     Q.  It says, "I'm surprised that I was not
11  included in the discussion on managing this issue
12  nor was I ever informed on the background on the
13  Ortha Chaugas (phonetical) test trial discussed
14  in e-mails below."  As of this time September
15  15th, 2006, did you feel that you were being
16  further excluded from information to assist you
17  to do your job?
18     A.  Absolutely.
19         MS. SHADI:  I was going to -- objection
20  here.  Assuming facts not in evidence.
21  BY MS. TELFER:
22     Q.  Did you get this e-mail in response from
23  Steve Brown saying this was a mistake?
24     A.  Yes.  This had huge a potential
25  financial ramification for the American Red

---

Marc Jackson                    January 30, 2008

Page 144

1  Cross.  It almost -- we had a very large contract
2  with Ortho Diagnostics, and they just, you know,
3  it was big, big, big, problems and national
4  headquarters went ballistic over it.  They were
5  not happy at all.  They just weren't happy at
6  all.
7      Q.  And as a communication --
8      A.  Why was I excluded?  I didn't understand
9  why?  I don't get it.  I wouldn't have been
10  excluded over this.  I mean Ross Herron who's a
11  world renown authority on it, you know, I just
12  would have prompted him to handle it, so I don't
13  understand why they kept excluding me from this
14  stuff.
15     Q.  Did anyone ever explain to you why you
16  were being excluded from this information?
17     A.  No.
18     Q.  I'm going to show you a document that
19  we'll mark as Exhibit 34.  At the top it's
20  entitled "Performance Improvement Plan for Marc
21  Jackson to Steve Brown.  I may be taking these
22  actually out of order.  I'm going to do it this
23  way instead.  I'm going to mark as Exhibit 34 a
24  memorandum entitled "Performance Improvement
25  Plan," Bates stamped MJ173 to 174.

---

Marc Jackson                    January 30, 2008

Page 145

1      (Exhibit No. 34 marked for identification.)
2  BY MS. TELFER:
3      Q.  Mr. Jackson, did you receive this
4  performance improvement plan from Steve Brown?
5      A.  Yes.
6      Q.  And was there an actual meeting in which
7  this document was discussed with you?
8      A.  Yes.
9      Q.  Were you surprised by it when you first
10  received it?
11     A.  I was surprised at the allegation, but
12  prior to that for like a month, staff coming into
13  me saying that HR was conducting this
14  investigation of me, and they were -- this is
15  their words, not mine, and they were trying to
16  twist their words around, and they would say
17  something one way and they try to say it, and
18  they go, no, I didn't mean that, and they were so
19  concerned, a number of them even went to HR and
20  said, I would like to see my statement and they
21  said they had no right to see the statement, and
22  so -- so then at this meeting I said, you know, I
23  didn't do this stuff.  You know what I mean?  One
24  of the things is like, you know, is like when I
25  talk loud, I can't -- one of my -- when I was

e9c1c78c-23c9-4af5-b32a-4482d0771f1e

Marc Jackson                           January 30, 2008

Page 146

```
 1   sick the first time, I cannot -- it's weird, but
 2   I cannot measure how loud I'm talking. I can't
 3   do it for some reason. I can hear okay, but I
 4   can be talking -- I don't know right now if I'm
 5   talking softly or I'm talking too loud, and so a
 6   lot of times I would be talking loud, and I can't
 7   even, you know -- but that's beside the point. I
 8   never talked, you know, about people's, you know,
 9   I forgot what it was -- body parts, and it was
10   just, I mean, and it really concerned me. To
11   this day I asked my staff -- it has been like a
12   year now, guys. I swear I'm obviously over it.
13   Did I do this? Please, if I did I want to know,
14   and they said, no, you didn't. You didn't do
15   this, Marc, and so I mean I just -- and then I
16   was told if I didn't sign this paper that I would
17   -- that they will consider it my voluntary
18   resignation.
19       Q.  Was this the first time termination or
20   your leaving the Red Cross ever discussed?
21       A.  Yes.
22       Q.  First of all, have you ever seen an
23   investigative report concerning you?
24       A.  They said I -- I asked for it, and they
25   said if I wanted to see it -- Bob Browning said
```

Esquire Deposition Services   520 Capitol Mall Ste. 250   Sacramento, C.A. 95814
Phone (916) 448-0505 (800) 610-0505     Fax (916) 448.8726

Marc Jackson                           January 30, 2008

Page 147

```
 1   if I wanted to see it, the only way I would be
 2   allowed to see it, is if I filed a lawsuit
 3   against the Red Cross. His exact words were
 4   "That is your right as an American." I said I
 5   really don't want to do that. He said well,
 6   you're going to have to sign the report. I can't
 7   do because it's not -- it's not telling the
 8   truth.
 9       Q.  Would it be a fair statement your
10   reputation is very important to you?
11       A.  Yes, of course.
12       Q.  And you've worked very hard for your
13   reputation?
14       A.  Right.
15       Q.  And your subordinates have shared with
16   you that they felt like they had a good working
17   relationship with you as of 2006?
18       A.  Correct.
19       Q.  And when the people came to you and said
20   that HR was twisting their words, did you observe
21   any affect on morale?
22       A.  Oh absolutely, absolutely.
23       Q.  Do you know who was conducting this
24   investigation?
25       A.  Barbara Kay.
```

Esquire Deposition Services   520 Capitol Mall Ste. 250   Sacramento, C.A. 95814
Phone (916) 448-0505 (800) 610-0505     Fax (916) 448.8726

Marc Jackson                           January 30, 2008

Page 148

```
 1       Q.  Would you like to see that report, if
 2   you could?
 3       A.  Absolutely.
 4       Q.  Would you have any objection on privacy
 5   grounds of it was requested?
 6       A.  No. Because and I don't mean this --
 7   seriously, I mean, I want to improve myself and
 8   if I did this stuff, I want to know about it, but
 9   they gave me one situation. They said that I was
10   screaming at somebody. It wasn't me screaming at
11   the person and my whole staff was going -- that
12   wasn't you. You were there trying to break it
13   up. It was so absolutely absurd, you know, but
14   they said that I was the one that was involved in
15   it. And I go, you know, then even if you're
16   worried about me, like, going after these people,
17   which I'd never do, then retract it. You know,
18   black out the names of the people who
19   supposedly -- but, you know, I mean if people are
20   making allegations, they should be -- a person
21   has a right to face their accuser. And then I
22   said -- this is what is the other thing. I said
23   okay, let's say I sign the report, just so we can
24   start out from scratch. I go, what happens if
25   somebody files another complaint? You're gone.
```

Esquire Deposition Services   520 Capitol Mall Ste. 250   Sacramento, C.A. 95814
Phone (916) 448-0505 (800) 610-0505     Fax (916) 448.8726

Marc Jackson                           January 30, 2008

Page 149

```
 1   It's automatic, and I go --
 2       Q.  Who said you were gone?
 3       A.  Bob Browning. And I go what's if it's
 4   anonymous? It doesn't matter. You're gone.
 5       Q.  Did he say when he discussed this
 6   improvement plan?
 7       A.  Yes.
 8       Q.  In regards on the accusations, were you
 9   told who made these accusations against you?
10       A.  They said that the photographer -- they
11   did admit that the photographer who was being
12   investigated by the finance department, who I
13   recommended to termination, you know, who was
14   stealing, they admitted that she was one of the
15   people, and so I kept going to HR, have you
16   called the finance department to ask them about
17   this investigation? And they go, no, and so then
18   I asked the finance department, I go finance
19   department, has HR called you? No, and so I'm
20   sitting there going, well, haven't you guys ever
21   thought that she may be trying to retaliate
22   against me because she's stealing company
23   property. She is lying about her mileage. It's
24   a prima fascia case. You can see -- I mean her
25   receipts don't match up with her mileage. Her
```

Esquire Deposition Services   520 Capitol Mall Ste. 250   Sacramento, C.A. 95814
Phone (916) 448-0505 (800) 610-0505     Fax (916) 448.8726

e9c1c78c-23c9-4af5-b32a-4482d0771f1e

Marc Jackson                                    January 30, 2008

Page 150

1   receipts will say, you know, that's she's in
2   Santa Monica, and she'll be claiming mileage
3   going to Pico Rivera. It's crazy, and that's
4   when I just, I mean, two days later I was in the
5   emergency room.
6       Q.  And so that's on or about February 24th?
7       A.  Yes -- or the 23rd. I think it was
8   actually the 23rd.
9       Q.  Did Barbara Kay ever interview you?
10      A.  Yes.
11      Q.  But she never informed you specifically
12  who complained?
13      A.  Right.
14      Q.  During the interview?
15      A.  Right.
16      Q.  And the accusation that are in this
17  improvement plan say that you talk about sexual
18  topics, personal information about people, did
19  that upset you when you heard what these alleged
20  accusations were?
21      A.  Well, yeah, especially when I don't --
22  they refused to give me any examples.
23      Q.  And was it your understanding that this
24  performance improvement plan was going to be
25  placed in your personnel file?

Marc Jackson                                    January 30, 2008

Page 152

1   and like Fairfax which is only about two miles
2   away from the Culver City office and, you know,
3   Dr. Peckaral was in South America, and they just
4   said, look, he's going to be back in a week or
5   so. Just wait for him, and they put me on, like,
6   a week's disability, and I started off on, like,
7   codeine and it just wasn't working and I think we
8   bumped it up Vicodin, and then I've gone from
9   Vicodin to Percodan to Oxytocin and now I'm on
10  morphine, morphine sulfate.
11      Q.  In addition to this written or this
12  performance improvement plan, did they give you a
13  written-verbal warning?
14      A.  Beforehand?
15      Q.  At some point.
16      A.  No, never. No -- and that's the other
17  thing I asked. I go if I'm using foul language
18  or something and people are offended, why don't
19  you just tell me, and I'm happy, you know, if I'm
20  offending someone, of course, I'm going to change
21  the way, you know, if I'm offending someone --
22  no. They never did. They just hit me with this.
23      Q.  I'm going show you a document and see if
24  I can refresh your recollection. I messed up on
25  the date. I'm going to show you a document

Marc Jackson                                    January 30, 2008

Page 151

1       A.  It is in my personnel file.
2       Q.  And they haven't taken it out yet?
3       A.  No. That is as far as I know.
4       Q.  Do you believe that you ever got the
5   opportunity to address these accusations to show
6   that you were innocent?
7       A.  There's no -- the only way I could do
8   that is if I, according to Bob Browning, if I
9   filed a lawsuit against the American Red Cross.
10      Q.  And did he tell you that during the same
11  meeting?
12      A.  Yes.
13      Q.  Once you received the performance
14  improvement plan, was it hard to go back to work
15  with your subordinates?
16      A.  Well, no, my staff was, like, really,
17  you know, they were flipped out because they were
18  totally afraid that they were going to be loosing
19  their job, I mean, I came in -- well, I went to
20  Culver City first I looked down and my legs was
21  just bleeding. I mean completely and totally, I
22  mean, just streaming blood down, and so that's
23  when I went, you know, I just didn't go to -- I
24  went to the nearest hospital I could find, which
25  was Olympia on -- Olympia is on Olympic Boulevard

Marc Jackson                                    January 30, 2008

Page 153

1   marked as Exhibit 35. But on the front says it's
2   February 23rd, 2007. It says "written-verbal
3   warning," but on the back it has signatures of
4   June 1st, 2007?
5       A.  Okay, this is when -- okay, yeah -- this
6   is when I came back, okay? Because they were
7   planning on giving me this, the day after I came
8   back, okay? And I was sick. I was in the
9   emergency room at Olympia. So Dr. Peckaral put
10  me on three month's leave of absence.
11      (Exhibit No. 35 marked for identification.)
12  BY MS. TELFER:
13      Q.  And when you say "I didn't get this
14  because they were going to give it to me the next
15  day," you mean the written-verbal warning?
16      A.  Right.
17      Q.  Had you ever had a written-verbal
18  warning before?
19      A.  No.
20      Q.  Had you ever been on an improvement plan
21  with the American Red Cross before?
22      A.  No.
23      Q.  After receiving the performance
24  improvement plan and this written-verbal warning,
25  did you have some concern that your days were

e9c1c78c-23c9-4af5-b32a-4482d0771f1e

Marc Jackson                    January 30, 2008

Page 154

1  numbered?
2     A. Absolutely. I mean if somebody is going
3  to file an anonymous complaint against you, and
4  you don't have a right to know who that person
5  is. I mean -- I mean it was like -- It was
6  bizarre. It was absolutely bizarre?
7     Q. And is it your understanding they put
8  Exhibit 35 in your personnel file as well?
9     A. Yes. And what happened is after -- what
10 happened with the meeting, with -- I was sitting
11 there in that meeting, and I was getting sick. I
12 could feel my legs tingling and I go "Oh my
13 God." Either my legs are going to start bleeding
14 or my joints are going to freeze, and so I go, I
15 just hope to God my joints don't freeze because,
16 you know, that would great, to be carried out of
17 this office, so I just went back to the office,
18 and my staff is in the office, and that's when I
19 called counsel. I go, what do I do here? I was,
20 you know, I was blown out. I was blown away. I
21 didn't know what to do, and if I talk loud it
22 wasn't meaning to make a scene. It was just
23 that, you know, I mean seriously I cannot -- and
24 I went through a test -- I forgot the guy's
25 name. He's the head of audiology at Cedars to --

---

Marc Jackson                    January 30, 2008

Page 155

1  I can't judge the volume at which I'm speaking,
2  and then again when they came back on the first,
3  I asked again. Can I be accommodated and Bob
4  Browning specifically denied accommodation again,
5  specifically denied it.
6     Q. Okay so on June 1st, 2007, you requested
7  accommodation. It was denied?
8     A. Correct.
9     Q. Did Steve Brown explain why?
10    A. Steve Brown had no part of it. It was
11 Bob Browning.
12    Q. Did Bob Browning explain why he was
13 denying your request?
14    A. He said that the staff needed total
15 supervision, that, you know, they need total and
16 complete supervision and that somebody had to be
17 there to catch them at all times.
18    Q. And if you had been able to hire a
19 communications manager, that person could have
20 done the supervising in that regard; correct?
21    A. Correct.
22    Q. And in the past Julie Jewelison had done
23 that as part of your job?
24    A. Correct.
25    Q. I'm going to show you a document I've

---

Marc Jackson                    January 30, 2008

Page 156

1  marked as Exhibit 36 and ask you if you saw this
2  note from Dr. Peckaral, taking you out on a
3  medical leave from March 1st of '07 to June 1st,
4  '07?
5     A. Correct.
6     (Exhibit No. 36 marked for identification.)
7  BY MS. TELFER:
8     Q. And then prior to that time he was in
9  South American, so you were off on disability?
10    A. Correct. Yeah, and Olympia sent them.
11 Two doctors at Olympia sent them. I had to go
12 back twice.
13    Q. So after getting this improvement plan,
14 this written-verbal warning, then being denied an
15 accommodation, did you feel as though you had no
16 other choice to keep your job, other than filing
17 a charge of discrimination?
18    A. Absolutely, I was told that. When the
19 HR director told you that, you know, what do you
20 do?
21    Q. I'm going to show you a document I'm
22 marking as Exhibit 37. It appears to be a
23 Department of Fair Housing and Employment charge
24 that has a date at the bottom of March 6th,
25 2007.

---

Marc Jackson                    January 30, 2008

Page 157

1     (Exhibit No. 37 marked for identification.)
2  BY MS. TELFER:
3     Q. Mr. Jackson, is that your signature on
4  the bottom of the page?
5     A. Yes, it is.
6     Q. And did you file this charge pursuant to
7  what Mr. Browning told you?
8     A. Yes.
9     MS. SHADI: Can we take a break?
10    MS. TELFER: Sure.
11    (Brief recess.)
12 BY MS. TELFER:
13    Q. Mr. Jackson, I'm going to show you a
14 document that I've marked as Exhibit 38. It's a
15 one-page document, dated May 24th, 2007, appears
16 to be from Dr. Peckaral, regarding your condition
17 and a request for accommodation that you work
18 partially from home?
19    (Exhibit No. 38 marked for identification.)
20    Q. Have you ever seen this document before?
21    A. Uh-huh.
22    Q. Is that a yes?
23    A. Yes.
24    Q. Did you provide this letter to Steve
25 Brown or did you think Dr. Peckaral wrote this?

e9c1c78c-23c9-4af5-b32a-4482d0771f1e

EXHIBIT **5**

27
1-30-08
Marc Jackson

**American Red Cross**                                      **Requisition for Personnel**

| DEPARTMENT:<br>Public Affairs | LOCATION:<br>Pomona | COST CENTER:<br>80400 |
|---|---|---|

| JOB TITLE:<br>Communications Manager | POSITION CONTROL#<br>W582 | FULL TIME ☒  PART TIME ☐  PER DIEM ☐<br><br>TEMPORARY ☐   END DATE:<br>START DATE: |
|---|---|---|

Hours to be worked: **8:30A - 5P**          Days to be worked: **M-F**

Replacement ☒ of: **Julie Sliusson**

New Position ☐ Reason for:

IS THIS POSITION PROVIDED FOR ON THE CURRENT APPROVED POSITION CONTROL LIST?        Yes ☒        No ☐

If answer is 'No', please attach justification

INTERVIEWING SUPERVISOR: **Marc Jackson**          PHONE NO.: **909 859 7362**

SPECIFIC DUTIES: **See attached as well as oversee celebrity outreach, gay outreach, focus group projects.**

SPECIAL QUALIFICATIONS: **See attached**

REMARKS: **Community contacts, team builder**

Requested by: **Marc Jackson**                          Date: **6 Feb 06**

Approved by Dept. Dir.: **(Marc Jackson)**            Date: **6 Feb 06**

Approved by Human Resources:                                Date:

Approved by DVP/CEO:                                           Date: **020706**

Approved by DVP/CEO: (Any New Position)              Date:

### FOR HUMAN RESOURCES USE ONLY

EMPLOYMENT COORDINATOR:                    DATE RECEIVED IN HUMAN RESOURCES:

POSITION FILLED BY:              START DATE:              SALARY:

INSTRUCTIONS:    Forward original copy to Human Resources

MJ003